**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DAMION HELMES,<br><br>        Defendant. | Crim. No. 19-928 (FLW)<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

This matter comes before the Court on an omnibus pretrial motion, filed by Defendant Damion Helmes ("Defendant"), seeking, among other things, a *Franks* hearing, a *Starks* hearing, and disclosure of the names of all Confidential Informants ("CI") present during any of the acts alleged in the indictment.  I held a motion hearing on August 4, 2022, at which I denied Defendant's motion as to his requests for a *Starks* hearing and disclosure of the names of any CIs. I also indicated that Defendant had failed to set forth the requisite showing for a *Franks* hearing with respect to the authorization of a wiretap used in this case, but provided Defendant with an opportunity to further review relevant evidence and submit a supplemental brief in support of his motion.  This Opinion memorializes my rulings on the record and addresses additional arguments raised by Defendant in his supplemental brief.

For the reasons set forth herein, Defendant's omnibus motion is **DENIED**.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Between July 2018 and April 2019, a CI, acting at the direction of law enforcement, executed over a dozen controlled purchases of narcotics allegedly from Defendant and his associates

in and around Monmouth County, New Jersey.   During this period, law enforcement conducted physical surveillance, pole camera surveillance, and analysis of telephone records and pen register data.   Law enforcement also acquired information from multiple confidential sources.   Based on this surveillance and investigation, as well as the controlled purchases, the Government submitted a Title III wiretap application to the Court seeking authorization to intercept wire and electronic communications from a telephone facility ending in 5706, used by Helmes to communicate with the CI.   In connection with the application, the Government submitted an affidavit, which, among other things, provided an overview of the investigation to date, listed the actions taken in furtherance of the conspiracy, outlined the goals of the investigation, and described the investigative techniques that had been attempted prior to applying for the wiretap.

On April 24, 2019, Judge Peter G. Sheridan, U.S.D.J, reviewed the application and authorized the interception of wire and electronic communications for a period of 30 days.   During that period, the Government intercepted a number of communications allegedly between Defendant and others, regarding possession and intent to distribute crack cocaine and powder cocaine, among other controlled substances.   Over the following months, the Government sought and obtained 30-day extensions of the wiretap, as well as additional wiretap orders for other relevant telephone facilities.

On August 21, 2019, the Government filed a sealed criminal complaint, charging Defendant and nineteen others with conspiracy to distribute and possess with intent to distribute 280 grams or more of cocaine base.   *See* ECF No. 1.  The complaint also charged Defendant and several others with conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine. *Id.*   In conjunction with the filing of the criminal complaint, the Magistrate Judge issued arrest warrants for each of the individuals charged.   That same day, law enforcement sought and obtained

2

warrants authorizing searches of various premises and vehicles, including a warrant to search Defendant's home in Cliffwood, New Jersey. During the search of Defendant's residence, law enforcement allegedly recovered, among other things, more than 100 grams of crack cocaine, approximately 94 grams of powder cocaine, approximately $7,204 in cash, a .45 caliber semi-automatic handgun, and hundreds of .45 caliber ammunition.

On December 16, 2021, a federal grand jury returned a six-count Second Superseding Indictment charging Defendant and others with (1) conspiracy to distribute and possess with intent to distribute 280 grams or more of cocaine base, and (2) conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine. *See* ECF No. 449. Defendant was separately charged with (1) possession with intent to distribute 28 grams or more of cocaine base, (2) possession with intent to distribute cocaine, (3) possession of a firearm in furtherance of a drug trafficking offense, and (4) possession of a firearm by a previously convicted felon. *Id.* Following several plea agreements with other conspiracy defendants, on August 25, 2022, a federal grand jury returned a six-count Third Superseding Indictment as to Defendant, alone, charging him with the above the crimes. *See* ECF No. 512.

Defendant filed his omnibus pretrial motion on March 31, 2022. ECF No. 476 ("Def. Mot."). The Government filed its opposition on May 12, 2022. ECF No. 492 ("Gov't Opp."). On August 4, 2022, I held a motion hearing, at which I largely denied Defendant's omnibus motion. However, at Defendant's request during the August 4 hearing, the Court permitted Defendant to file a supplemental brief regarding the validity of the affidavit supporting the wiretap application. Defendant filed a supplemental motion to suppress on September 8, 2022. ECF No. 520 ("Def. Supp. Mot."). The Government opposed the supplemental motion on September 9, 2022. ECF No. 521 ("Gov't Supp. Opp.").

## II.  DISCUSSION

Defendant asserts several evidentiary arguments in his pretrial motion.[1]  First, Defendant argues that a *Franks* hearing is warranted because the affidavit filed in support of the wiretap application as to Defendant's 5706 facility was materially misleading due to the unreliability of the CI and the Government's failure to follow proper CI protocols.  Defendant also contends that the affidavit includes material misrepresentations as to whether certain transactions between Defendant and the CI were captured on audio and video recordings.  Def. Mot. 14–16; Def. Supp. Mot. 3–5.  Alternatively, Defendant argues that the wiretap was not necessary because other, traditional investigative techniques were sufficient to accomplish law enforcement's goals.  Def. Mot. 16–17.  Second, Defendant assets that a *Starks* hearing is necessary to determine the audibility and admissibility of certain tape recordings in the Government's possession.  Def. Mot. 8.  Third, Defendant seeks the disclosure of the identities of any CIs used by law enforcement in the course of the investigation.  Def. Mot. 10.  As set forth in detail below, I find that each of Defendant's requests fails under the applicable legal standards.

### A.  *Franks* Hearing

"The Fourth Amendment prohibits the intentional or reckless inclusion of a material false statement (or omission of material information) in a search-warrant affidavit."  *United States v. Pavulak*, 700 F.3d 651, 665 (3d Cir. 2012) (citing *United States v. Yusuf*, 461 F.3d 374, 383–84 (3d Cir. 2006)).  "In *Franks*, the Supreme Court determined that a criminal defendant has the right to challenge the truthfulness of factual statements made in an affidavit of probable cause

---

[1] At the August 4 hearing, certain of Defendant's motions were resolved without substantive argument, including Defendant's request for all *Brady* and *Giglio* material and Defendant's request for all Jencks Act material.  The Court also set a briefing schedule as to any Fed. R. Evid. 404(b) motions.

supporting a warrant subsequent to the ex parte issuance of the warrant." *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)).

Notably, there is "a presumption of validity with respect to the affidavit supporting a search warrant[,]" *Franks*, 438 U.S. at 171, and thus, to obtain a hearing under *Franks*, the defendant must make a "substantial preliminary showing" (1) "that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth" and (2) that the false statement "is material to the finding of probable cause." *Yusuf*, 461 F.3d at 383 (quoting *Franks*, 438 U.S. at 171).

Under the first prong, a defendant's showing "cannot rest on mere conclusory allegations." *Yusuf*, 461 F.3d at 383 n.8. Rather, the defendant "must specifically identify allegedly false statements or omissions in the affidavit," and "must also provide an offer of proof or give a satisfactory explanation for the absence of proof. Sworn affidavits or reliable statements from witnesses are examples of offers of proof sufficient to satisfy the substantial preliminary showing." *United States v. Heilman*, 377 F. App'x 157, 177 (3d Cir. 2010) (citing *Franks*, 438 U.S. at 171; *Yusuf*, 461 F.3d at 383 n.8). Regarding the affiant's *mens rea*, the Third Circuit has stated that "[a]n assertion is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *Wilson v. Russo,* 212 F.3d 781, 788 (3d Cir. 2000) (citations omitted). "[R]eckless disregard for the truth means different things when dealing with omissions and assertions" in an affidavit. *Wilson*, 212 F.3d at 787. "[O]missions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know[.]" *Id*. at 783. And "assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what

he or she is asserting." *Id*.

With respect to the second prong, affirmatively false statements or omissions are "material to the finding of probable cause if the affidavit, 'with the . . . false material set to one side . . . is insufficient to establish probable cause.'" *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997) (citing *Franks*, 438 U.S. at 156). At the hearing, the defendant must ultimately prove by a preponderance of the evidence that "the affiant knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant," and that "such statements or omissions were material, or necessary, to the probable cause determination." *Id*. (citing *Franks*, 438 U.S. at 171–72).

Here, Defendant argues that because law enforcement failed to follow proper CI protocol during the controlled purchases, there is no reliable basis to support a finding that the CI, in fact, purchased narcotics from Defendant, and therefore, the Government's affidavit misrepresented the quality of its knowledge of Defendant's activities. *See* Def. Mot. 15–16. Specifically, Defendant maintains that law enforcement failed to search the CI before the controlled purchases to ensure that the CI did not already possess the narcotics he was purportedly purchasing from Defendant, inferring that the CI ultimately kept the money given to him for the controlled purchase and provided law enforcement with narcotics already in his possession. *Id*. at 16 ("This type of 'rip off' is common in drug trade investigation. The CI was getting paid by the FBI and at the same time making money by selling them the CDS and blaming it on Mr. Helmes."). Defendant argues that these protocols were particularly necessary because the CI was "a criminal, junkie, dope dealer" who was "not a citizen of good repute, but rather a 'junkie' drug dealer, himself[,]" and thus, had "no independent credibility[.]" *Id*. at 15–16. Defendant also asserts that the Government's affidavit purposely omitted that the CI and Defendant were cousins and often met

under innocent circumstances.   Defendant contends that because the CI, who was utilized without proper protocols, was the only source of confidential information, and the affidavit did not state that the CI and Defendant were cousins who often met for non-drug-related reasons, the controlled purchases had no probative value.    For this reason, Defendant argues that the Government misrepresented the quality of the officers' knowledge about the alleged illegal activity, and therefore, the "entire affidavit for the wiretap [is] misleading and false, in violation of the Wiretap Act." *Id*. at 16.   In his supplemental brief, Defendant, having reviewed various video recordings referenced in the affidavit, further argues that on at least six different occasions[2] the affiant swore that there were audio and video recordings of certain transactions between Defendant and the CI, when, in fact, the relevant video recordings show no such transaction.  Def. Supp. Mot. 3–5.

In the alternative, Defendant asserts, should this Court find that the affidavit was proper, that the wiretap evidence should be suppressed because other traditional investigative techniques were sufficient, and therefore the wiretap was not necessary.  Def. Mot. 16–17.  As support, Defendant points out that the Government developed the source of Defendant's narcotics by using undercover buys and consensual recordings.   *Id*.

The Government first responds that Defendant failed to specifically identify any false statement or omission, and instead, Defendant merely questions the credibility of the CI.   Gov't Opp. 9.   Regardless, the Government argues that Defendant has not offered anything more than conclusory allegations that the affiant acted with reckless disregard for the truth in repeating the CI's information, and therefore, Defendant did not provide the required substantial preliminary showing.   *Id*. at 10.   The Government further maintains that the CI was, indeed, reliable, and that

---

[2] Defendant specifically refers to the controlled purchases that took place on August 8, 2018, August 15, 2018, September 5, 2018, October 18, 2018, November 20, 2018, December 11, 2018, December 18, 2018, and January 24, 2019.  Def. Supp. Mot. 3–5.

the CI provided law enforcement with truthful information about Defendant's narcotics distribution activities and conducted controlled purchases at law enforcement's direction and supervision.   *Id.* at 11.    The Government noted, rebutting Defendant's theory that the CI already possessed the drugs supposedly being purchased, that the officers conducted physical surveillance of each controlled purchase described in the affidavit, and all but two controlled purchases were audio and video recorded.   *Id.*   The Government also directly disputes Defendant's contention that the FBI failed to search the CI prior to the controlled purchases, highlighting that the affidavit shows that law enforcement searched the CI and his vehicle before eight of the controlled purchases to ensure that the CI did not have cash or drugs.   *Id.*   In response to Defendant's supplemental brief, the Government argues that the statements in the affidavit challenged by Defendant are truthful, as each of the relevant meetings between Defendant and the CI were audio and video recorded, even if the actual hand-to-hand exchange of drugs for money is not visible on certain recordings.  Gov't Supp. Opp. 2.  Moreover, even without considering the statements regarding the audio and video recordings of the controlled purchases, the affidavit still provides ample basis for Judge Sheridan's probable cause determination.  *Id.*

As to Defendant's alternative necessity argument, the Government maintains that its Title III affidavit provided a detailed overview of the goals of the investigation, meticulously described how other normal investigative methods had been tried, and explained why these methods failed or were reasonably unlikely to accomplish the goals of the investigation.   These methods included physical surveillance, search warrants, and interviews with targets.  Gov't Opp. 12–25.

### 1.    *The Validity of the Wiretap Affidavit*

Defendant has failed to present substantial preliminary evidence that there were factual misstatements or omissions made knowingly and deliberately, or with reckless disregard for the

truth.  But even assuming that the few, specific statements challenged by Defendant were made with reckless disregard, such statements were not material to the probable cause determination.

     As an initial matter, Defendant largely bases his argument on mere guesswork, and fails to make any offer of proof, such as an affidavit or reliable witness statement, supporting that the wiretap application affidavit contained a false statement or omission.  *See Yusuf*, 461 F.3d at 383 n.8; *Heilman*, 377 F. App'x at 177.    Indeed, as a threshold matter, Defendant fails to identify "specifically the portion of the warrant affidavit that [he] claim[s] to be false," and instead argued that the entire affidavit is false and misleading.  *Franks*, 438 U.S. 154 at 171 ("[Defendant] should point out specifically the portion of the warrant affidavit that is claimed to be false[.]"); *Heilman*, 377 F. App'x at 177 (noting that Defendant "must specifically identify allegedly false statements or omissions in the affidavit[.]").  Later, in his supplemental briefing, Defendant identifies several purportedly false assertions in the affidavit, which state that transactions between Defendant and the CI were audio and video recorded.  According to Defendant, those statements are false because the recordings do not capture the transaction itself.  Def. Supp. Mot. 3–5.  However, read in context, these statements cannot be said to be false, nor are the statements material.

     With respect to Defendant's challenge to the affidavit as whole, Defendant has not shown that the affiant's statements were made with knowledge of falsity, or that the affiant drafted the affidavit with a reckless disregard for the truth of its contents due to an unreliable CI.   The CI had provided law enforcement with reliable information about Defendant's narcotics distribution in Monmouth County.   Gov't Opp., Ex. A ¶¶ 15–19 ("Affidavit").   Furthermore, the CI conducted numerous controlled purchases from Defendant under direction and supervision of law enforcement.  *Id*.   Law enforcement conducted physical surveillance of each of the controlled purchases described in the affidavit and recorded all but two of the purchases.  *Id*. ¶¶ 21–83.   In

addition, while the officers failed to search the CI before the first five purchases, as pointed out by Defendant, for the subsequent eight purchases, law enforcement did, indeed, search the CI and his vehicle to ensure he was not in possession of cash or narcotics, which included the controlled purchase where Defendant communicated with the CI using the telephone facility that was subject to the initial Title III order. *Id.* ¶¶ 43, 45, 48, 52, 53, 55, 56, 59, 60, 62, 63, 67, 72, 75, 80, 82. As such, the officers did not merely trust the word of someone Defendant deems untrustworthy, but they verified the CI's information through physical surveillance, searches of the CI, and other investigative techniques.    Therefore, because Defendant has failed to show that the affiant had any "obvious reasons to doubt the truth of what he or she [asserted]," Defendant's arguments about the CI's credibility and its effect on the wiretap affidavit's validity is rejected. *Wilson*, 212 F.3d at 783.

Defendant's supplemental argument as to the affiant's specific statements regarding the audio and visual recordings of the controlled purchases is similarly unpersuasive.  First, the affidavit is factually accurate in its representations that the encounters and transactions between Defendant and the CI were "audio and video recorded," regardless of whether the physical hand-to-hand exchange was visible on the videos.  Second, the challenged statements were not material to the probable cause finding as the affidavit provides more than sufficient detail regarding the relevant controlled purchases, including that the CI communicated with Defendant about the purchases, that the CI met with Defendant or his associates for each transaction, and that the CI met with law enforcement before and after each transaction. *See United States v. Gordon*, 664 F. App'x 242, 245 (3d Cir. 2016) ("[I]f a district court determines the defendant has failed to make that showing with respect to either prong [under *Franks*], there is no need for the court to proceed any further for the defendant then is not entitled to a hearing, much less suppression.").  Thus,

Defendant cannot point to any material misrepresentations warranting a *Franks* hearing.

Regarding the asserted omission, Defendant has not shown that it either was recklessly omitted or that it was material.   Defendant notes that the affidavit omits that he and the CI were cousins and often met under innocent circumstances.   But Defendant does not explain how this information was of such importance that "any reasonable person would know that a judge would want to know" about it.   *Wilson*, 212 F.3d at 783.   Defendant appears to imply, as part of his broader assertion that the controlled purchases never happened, that because he and the CI often met under innocent circumstances, this is further proof that the controlled purchases might not have occurred.   However, as stated in the affidavit, the Government conducted physical surveillance, as well as audio and visual surveillance in most cases, of the controlled purchases, verifying that the meetings between Defendant and the CI were for the purpose of narcotics purchases, rather than "innocent" meetings.   Further, Defendant provides no evidence as to how such an omission would have affected Judge Sheridan's probable cause finding.   For these reasons, this omission does not warrant a *Franks* hearing.

### 2.   *The Necessity of the Wiretap*

Under 18 U.S.C. § 2518(3)(c), a judge may enter an *ex parte* order for a wiretap "if the judge determines on the basis of the facts submitted by the applicant that," among other things, "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(3)(c).   The purpose of this "necessity requirement" is "to make doubly sure that the statutory [wiretap] authority be used with restraint and only where circumstances warrant the surreptitious interception of wire and oral communications."   *United States v. Bailey*, 840 F.3d 99, 114 (3d Cir. 2016) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)) (internal quotation marks omitted).   Notably

though, this provision "does not require the government to exhaust all other investigative procedures before resorting to electronic surveillance." *Id.* (quoting *United States v. Williams*, 124 F.3d 411, 418 (3d Cir. 1997)) (internal quotation marks omitted). Nor does the Government need to "prove to a certainty that normal investigative techniques will not succeed[.]" *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir. 1975). Rather, "[t]he Government need only lay a factual predicate sufficient to inform the judge why other methods are not sufficient." *Bailey*, 840 F.3d at 114. In so doing, the "statutory burden on the government is not great," *Armocida*, 515 F.2d at 38, and courts are to consider whether the necessity requirement was met in a "practical and commonsense fashion." *United States v. McGlory*, 968 F.2d 309, 345 (3d Cir. 1992).

Here, the Government's affidavit sets forth 15 pages of sufficient factual predicate to inform Judge Sheridan why normal investigative techniques were insufficient. The affidavit states that although "normal investigative techniques have been and will continue to be used to the extent possible, they are not reasonably likely to accomplish adequately the overall goals of the investigation[,]" which were "to determine the complete scope of the organization in which the Subjects are participants and to identify other participants and the roles played by such participants." Affidavit ¶ 101. In particular, the Government noted that at that point, it had not been possible to "identify fully the sources of distribution, supply, or all of the members of this drug-trafficking conspiracy." *Id.* At the time of submitting the affidavit, law enforcement had performed physical surveillance, analyzed telephone records and pen-trap data, used a confidential informant, conducted consensual recordings of telephone and in-person conversations, used a pole camera, and executed search warrants for GPS location data on a target telephone facility. *Id.* ¶ 102. Furthermore, law enforcement considered the use of a federal grand jury, personal interviews with one or more subjects, premises search warrants, trash pulls, and mail cover requests, but

determined "that these investigative methods are unlikely to succeed or meet the goals of the investigation, or are too risky to employ." *Id*.

For each type of surveillance used or considered, the Government provided a detailed account of both the successes and limitations of that method.   For example, regarding physical surveillance, the Government explained that physical surveillance had assisted law enforcement in confirming and documenting meetings with Defendants and determining locations that subjects frequent and where purchases take place.  *Id*. ¶ 103.   But, despite the use of physical surveillance, the Government claimed that the investigators had been unable to sufficiently identify important aspects of the conspiracy needed to achieve their objectives.   *Id*. ¶ 104.   For example, the Government stated that physical surveillance had not permitted law enforcement to discover stash locations or methods by which conspirators obtained supplies of narcotics.  *Id*.   Additionally, physical surveillance was insufficient to fully identify individuals that the CI or law enforcement did not already know or determine where future non-controlled purchases will ultimately occur. *Id*.   The Government also stated that Defendant is highly attuned to the possible presence of law enforcement, and has taken proactive measures to avoid law enforcement detection.   *Id*. ¶ 105. In sum, the Government asserted that "physical surveillance to date ha[d] not allowed law enforcement to understand the full extent or structure of the conspiracy.   Extensive physical surveillance by itself would not likely lead to the identification of other co-conspirators."   *Id*. ¶ 108.

As another example, the Government discussed the limitations of their CI.  While the CI had been productive, the Government maintained that the CI's dealings with Defendant had been "limited" and "do not provide a clear picture of the scope of the" conspiracy.  *Id*. ¶ 113.   The Government noted that any further attempt to have the CI infiltrate the organizations could raise

the targets' suspicions and jeopardize the health and safety of the CI, other confidential sources, and/or law enforcement.  *Id.*  In addition, the CI had been unable to identify the lines of supply for the trafficking conspiracy, nor did the CI help to determine the broader nature and scope of the trafficking conspiracy.  *Id.*

In light of the detailed showing that normal investigative techniques were insufficient to uncover important elements of the conspiracy, the affidavit meets the necessity requirement. Despite Defendant's argument that law enforcement was able to make the controlled purchases and uncover the name of the source of drugs through traditional investigative methods, merely uncovering certain aspects of a conspiracy does not negate the need for wiretaps.   As the Third Circuit has noted, "even where traditional investigative techniques may be sufficient to implicate some members of a conspiracy, wiretaps are permissible to uncover the full scope of the conspiracy."  *United States v. Braddy*, 722 F. App'x 231, 235 (3d Cir. 2017); *Bailey*, 840 F.3d at 114–15 ("As we have previously explained, where normal investigative techniques might have been sufficient to implicate the conspiracy leader in drug trafficking, such approaches are sometimes insufficient to determine the scope of the conspiracy or the nature of the conspiracy leader's on-going criminal activity.  Instead, in the proper circumstances, the instrumentalities of Title III may be employed to discover the full extent of crimes and conspiracies." (internal quotation marks and citation omitted)).  While physical surveillance, the use of a CI, and other techniques have discovered valuable evidence, these techniques are limited and appear to be insufficient to uncover the full scope of the conspiracy.   As such, the wiretap in this case meets the necessity requirement.

**B.**   ***Starks* Hearing**

In *United States v. Starks*, 515 F.2d 112, 121 (3d Cir. 1975), the Third Circuit recognized

that "[t]ape recordings are not readily identifiable as the original version" because they "are peculiarly susceptible of alteration, tampering, and selective editing."   For this reason, "[w]hen a colorable attack is made as to a tape's authenticity and accuracy, the burden on those issues shifts to the party offering the tape, and the better rule requires that party to prove its chain of custody." *Id*. at 122.   Once the burden shifts, the Government must "produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings."   *Id*. at 121 (quoting *United States v. Knohl*, 379 F.2d 427, 440 (2d Cir. 1967)).   *Starks* identified a seven-part test for establishing this foundation, although the Third Circuit has stated that it explicitly "did not intend to establish 'a uniform standard equally applicable to all cases.'"   *United States v. Credico*, 718 F. App'x 116, 119 (3d Cir. 2017).   These factors are:

> (1)   That the recording device was capable of taking the conversation now offered in evidence.
> (2)   That the operator of the device was competent to operate the device.
> (3)   That the recording is authentic and correct.
> (4)   That changes, additions or deletions have not been made in the recording.
> (5)   That the recording had been preserved in a manner that is shown to the court.
> (6)   That the speakers are identified.
> (7)   That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

*Id*. at 119 n.3.   Notably, Federal Rule of Evidence 901[3] was enacted after *Starks*, and the Third Circuit has opined that "[i]t is unclear whether *Starks* remains relevant after [Fed. R. Evid. 901's] enactment[.]"   *United States v. Tahn Le*, 542 F. App'x 108, 117 n.8 (3d Cir. 2013).   Regardless, the "Circuit Court continues to reference the *Starks* factors in the consideration of the admissibility

---

[3] Fed. R. Evid. 901(a) states: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."

of audio recordings." *United States v. Madera*, No. 17-928, 2019 WL 2509896, at *3 (M.D. Pa. June 14, 2019) (citing *Flood v. Schaefer*, 654 F. App'x 130, 133 (3d Cir. 2018)).

Here, Defendant has "not presented a 'colorable attack' as to the authenticity of any audiotape or video tape so as to shift the burden to the Government and justify a hearing." *United States v. Gatson*, No. 13-705, 2014 WL 7182275, at *26 (D.N.J. Dec. 16, 2014), *aff'd*, 744 F. App'x 97 (3d Cir. 2018). Instead, Defendant has requested a hearing simply because there will be audio recordings presented at trial; indeed, Defendant submits that "[i]n the event that tape recordings of conversations are relevant to Mr. Helmes, he requests a hearing to determine the audibility and admissibility of the tape recording[.]" Def. Mot. 8. Moreover, Defendant has failed to respond to the Government's contention that the Government will be able to authenticate the recordings at trial, and why that course of action would not be prudent or sufficient to protect Defendant's interests. *See Tahn Le*, 542 F. App'x at 117 n.8 ("In any case, the Government averred in its pretrial motion that each of the *Starks* factors was met. Le failed to oppose the Government's motion; as a result, he waived his right to a *Starks* hearing."); *Madera*, 2019 WL 2509896, at *4 (noting that Defendant made averment about "tangled exchanges among speakers" but finding that because Defendant failed to refute the Government's contention that it can authenticate the recordings at trial, "the Court cannot conclude that the Government will be unable to make the required showing at trial or that a *Starks* hearing is necessary to establish that the Government can meet its burden of admissibility[.]"). In fact, the Government maintains, here, that "[a]t trial, the government will authenticate any audio recordings to be admitted into evidence through the testimony of law enforcement witnesses with direct knowledge of the recorded telephone conversations." Gov't Opp. 30. The Government also maintains that because the wiretapped calls were generated with equipment utilized by the FBI in the Title III investigation, "agents will be

16

able to testify at trial as to the as to the accuracy of the equipment and the integrity of the recordings." *Id*. For these reasons, Defendant's request for a *Starks* hearing is denied.

### C. Request to Disclose the Identities of Confidential Informants

"[T]here is a qualified privilege possessed by the Government to refuse to disclose the identity of a confidential informant from whom it has received information about alleged criminal activity." *United States v. Bazzano*, 712 F.2d 826, 839 (3d Cir. 1983) (citing *Roviaro v. United States*, 353 U.S. 53 (1957)). "The scope of the privilege is limited by its underlying purpose, which is the furtherance and protection of the public interest in effective law enforcement[.]" *United States v. Rivera*, 524 F. App'x 821, 826–27 (3d Cir. 2013) (quoting *Roviaro*, 353 U.S. at 59, 60) (internal citations and quotation marks omitted). Thus, "[i]n determining whether the privilege should be sustained, a court must 'balanc[e] the public interest in protecting the flow of information against the individual's right to prepare his defense.'" *Bazzano*, 712 F.2d at 839 (quoting *Roviaro*, 353 U.S. at 62).

"[T]he first step in determining whether the identity of an informant must be disclosed is to ascertain what need, if any, the defendant has alleged for disclosure." *United States v. Jiles*, 658 F.2d 194, 197 (3d Cir. 1981). The Third Circuit has stated that situations where the Government may be required to disclose an informant's identity include when "(1) the [informant's] possible testimony was highly relevant; (2) it might have disclosed an entrapment; (3) it might have thrown doubt upon the defendant's identity; and (4) the informer was the sole participant other than the accused, in the transaction charged." *Jiles*, 658 F.2d at 198–99. On the other hand, "[m]ere speculation as to the usefulness of the informant's testimony to the defendant is insufficient to justify disclosure of his identity." *Bazzano*, 712 F.3d at 839 (quoting *United States v. Estrella*, 567 F.2d 1151, 1153 (1st Cir. 1977). In addition, where "an informant's role

17

was in validating a search, disclosure of his identity is not required." *Id.* (citing *McCray v. Illinois*, 386 U.S. 300 (1967)); *United States v. Stanton*, 566 F. App'x 166, 168 (3d Cir. 2014) (noting that when an "informant's role relates to probable cause, disclosure is usually not required" and finding that district court did not abuse its discretion in denying CI disclosure motion because "the informants' role[] pertained to probable cause[.]"); *Rivera*, 524 F. App'x at 827 ("Because the record suggests that the informants' roles were limited to validating the search, which is not a sufficient purpose to compel disclosure of their identity, the District Court did not abuse its discretion when it declined to compel the disclosure." (internal citation omitted)).   Importantly, the "burden is on the defendant to show the need for disclosure." *Jiles*, 658 F.2d at 197.

"The second part of the '*Roviaro* test' requires a balancing of the [Defendant's] interest in disclosure against the Government's interest in maintaining the confidentiality of its informant." *Id.* at 198.  "If the result of this balance is that disclosure of the informer's identity will be essential to a fair determination of a cause, the Government's privilege must give way." *Id.*

Here, Defendant has failed to meet his burden to show the need for disclosure.   Defendant argues that the "informants may be critical witnesses to certain events alleged by the Government" because he "believe[s] that these informants were present at the time the incidents alleged took place." Def. Mot. 10.   This is insufficient to meet Defendant's burden.  First, "mere speculation as to the usefulness of the informant's testimony to the defendant is insufficient to justify disclosure of his identity."   *Bazzano*, 712 F.2d at 839.   In accordance with precedent, Defendant's vague assertions that he "believes" informants were present at "certain events" and that the informants "may be" critical witnesses are inadequate to overcome the "the public interest in effective law enforcement."   *Rivera*, 524 F. App'x at 827.   Second, as the Government notes, "the informants in this case simply participated in the preliminary stage of the investigation by providing

information to the police and conducting controlled purchases of narcotics from Helmes and his associates."   Gov't Opp. 27.   Indeed, the Government points out that "neither Helmes nor any of his co-conspirators have been charged in the indictment with any of the controlled purchases conducted by the informants during the preliminary stage of [the] investigation."   *Id*. at 27–28. Thus, the informants' testimony is not "highly relevant" such that it is essential to the fair determination of this case.   *See Jiles*, 658 F.2d at 198–99.   Rather, the informants assisted law enforcement in gathering evidence to obtain probable cause, and, in turn, a search warrant.   The physical evidence seized while executing that search warrant formed the basis for Defendant's charges for possession and intent to distribute.   As such, because the charges are based on the seized physical evidence, rather than the assistance provided by confidential informants, Defendant does not have an interest in the confidential informants' identities. *See Bazzano*, 712 F.2d at 839 ("So far as appears, the informant's role in this case was nothing more than that of allegedly providing the police with probable cause of conducting their search . . . . The evidence of [the defendant's] guilt consisted primarily of the physical evidence seized during the search. Where an informant's role was validating a search, disclosure of his identity is not required."). Thus, disclosure of the identities of any CIs used in course of the investigation is not warranted.

## III.   <u>CONCLUSION</u>

For the reasons set forth above, Defendant's motion is **DENIED**.   An appropriate Order shall follow.

DATE: September 19, 2022

/s/ Freda L. Wolfson
Freda L. Wolfson
U.S. Chief District Judge
